IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re<br><br>H.K. PORTER COMPANY, INC.,<br>    Debtor<br>_____<br><br>CONTINENTAL CASUALTY CO.,<br>CONTINENTAL INSURANCE CO.,<br>TRANSPORTATION INSURANCE CO.,<br>AND COLUMBIA CASUALTY CO.,<br>    Appellees,<br><br>v.<br><br>H.K. PORTER COMPANY, INC.; H.K.<br>PORTER COMPANY, INC. ASBESTOS<br>TRUST,<br>    Appellants. | Civil Action No. 07-00189<br><br>Honorable Joy Flowers Conti<br><br>(Appeal related to<br>  Bankruptcy Case No. 91-468<br>  and Adversary Proceeding<br>  No. 05-3145) |

## MEMORANDUM OPINION

CONTI, District Judge.

### I. Introduction

The matter pending before the court is an appeal from the December 26, 2006 Order (the "Order") issued by the United States Bankruptcy Court for the Western District of Pennsylvania and entered in Bankruptcy Case No. 91-20468, Adversary Proceeding No. 05-3145. (Doc. Nos. 7, 7-2). Appellants H.K. Porter Company, Inc. ("Porter") and H.K. Porter Company, Inc. Asbestos Trust (the "Porter Trust" and collectively with Porter, the "Porter Entities") filed this appeal, pursuant to 28 U.S.C. § 158(a), from the Order, granting summary judgment in favor of appellees, Continental Casualty Company, Continental Insurance Company ("Continental"), Transportation Insurance

Company and Columbia Casualty Company (collectively the "Carriers") and against the Porter Entities. *Id.* This court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

The primary issue raised in this appeal is whether a release contained in a settlement agreement entered into among the Porter Entities and the Carriers encompassed a release of the Porter Entities' claims against a predecessor or assignor of one of the Carriers. Because the bankruptcy court did not err in determining that the breath of the release contained in the settlement agreement covered the Carriers and their predecessors and assignors, the court will affirm the order of the bankruptcy court.

## II. Factual and Procedural Background

The following undisputed facts are gleaned from the hearings held before the bankruptcy court, the submissions of the parties and the bankruptcy court's opinion issued December 26, 2006 (the "Opinion") in connection with the Order.

In 1991, Porter filed for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* Porter had been involved in the manufacture, distribution and sale of products containing asbestos and, consequently, had been named as a defendant in numerous lawsuits for wrongful death, personal injury and property damage. Porter sought coverage for those claims raised in the lawsuits under various insurance policies including the general liability and excess policies (the "Policies") issued by the Carriers. Porter and the Carriers litigated their respective rights and obligations in connection with the Policies in bankruptcy court and, ultimately, the Porter Entities and the Carriers entered into a settlement agreement ("Settlement Agreement") which was approved by the

bankruptcy court on June 20, 2000. The release included in the Settlement Agreement, in exchange for which the Carriers paid $12,400,000.00 to the Porter Entities, provided as follows:

> 3.3 For its part, and in return for the Settlement Payment, [each of the] Porter [Entities]¹ hereby fully, finally and forever compromises, settles, **releases** and discharges **each of the Carriers and their predecessors**, successors, **assignors**, assigns, divisions and merged or acquired companies or operations, employees, officials, agents, attorneys, representatives, officers and directors **from any and all past, present, or future** actual, alleged or potential obligations, **claims**, actions, debts, damages, liabilities, **expenses**, demands **and causes of action, known or unknown**, *including but not limited to all claims, contractual or extracontractual, for costs and liabilities associated with or in any way related to any insurance policies issued or allegedly issued by the Carriers at any time*. [Each of the] Porter [Entities] intends, with respect to all such claims, to release the Carriers to the fullest extent permitted by law, and will dismiss or discontinue with prejudice any proceeding pending against any of them and will not institute any action or proceeding against them concerning any of the Policies. This release shall become effective immediately and automatically upon [each of the] Porter [Entities]'s receipt of the Settlement Payment. The Agreement does not affect any obligation of the Carriers to make payment to any person or entity other than the Debtor pursuant to the terms of any non-liability policy provided that the Carriers explicitly assumed such obligation by separate agreement or understanding subsequent to the issuance of such policy and prior to the date of this Agreement. This Agreement does not affect any rights of any person or entity other than the Debtor who is or was insured in life insurance policies and disability policies issued prior to the date of this Agreement.

(Doc. No. 7-3) (emphasis added). A list of the Policies issued by the Carriers to Porter is attached to the Settlement Agreement as "Attachment A." *Id.* The Carriers reciprocated with a nearly identical release of any and all claims against the Porter Entities in section 3.4 of the Settlement Agreement. *Id.*

---

¹The Settlement Agreement referred to Porter and the Porter Trust collectively as "Porter."

3

Following the conclusion of its litigation with the Carriers, Porter continued to pursue insurance coverage for its asbestos claims from other insurance companies, including Harbor Insurance Company ("Harbor"), which issued at least two policies to Porter (the "Harbor policies"). Coverage was refused by the carrier under the Harbor policies for the reason that Continental, one of the Carriers, had assumed Harbor's liabilities and, as a result of this relationship with Continental, Harbor was released by the terms of the Settlement Agreement.

On September 17, 2003, the Porter Entities filed a Motion to Clarify the Terms of the Settlement Agreement, seeking a determination from the bankruptcy court that the Settlement Agreement did not apply to or release Harbor from its obligations to provide coverage under the Harbor policies. On April 14, 2004, the bankruptcy court held a hearing on the motion. During the hearing, counsel for the Porter Entities advised the bankruptcy court that the Porter Entities were not aware whether Harbor had any assets. The Harbor policies were issued decades prior to the hearing, i.e., one was issued in 1974. (Tr. of hearing held Apr. 14, 2004, "Tr." at 3). Harbor had an indemnification for liabilities under the Harbor policies through an assumption agreement with Continental. Id. at 3-4. The bankruptcy court asked if there was a judgment against Harbor, who would pay the judgment. Counsel for the Porter Entities acknowledged that the money would come from Continental. Id. at 5. The Porter Entities had already commenced an arbitration proceeding against Harbor.

| Counsel for the Porter Entities: | We ended up filing dual proceedings, the arbitration as well as this motion to clarify. When we started pursuing Harbor, that was in the late 1990s. And the settlement agreement between Porter and the carriers, the [Continental] carriers, occurred in 2000. |
|---|---|

4

Id. at 8. The court inquired when the Porter Entities knew about the Harbor policies.

| | |
|---|---|
| The Court: | When did you find out about the Harbor policy? |
| Counsel for the Porter Entities: | We've always know about the Harbor policies. |
| The Court: | Was it discussed in this settlement? |
| Counsel for the Porter Entities: | It wasn't discussed in the settlement, no. |
| The Court: | Had you pursued Harbor before that? |
| Counsel for the Porter Entities: | Correct, yes. In the late 1990s we had our first letters going out to Harbor. |
| The Court: | Did you know it was a subsidiary of Continental . . . ? |
| Counsel for the Porter Entities: | I don't know the exact, - - - I mean, it's never really been described to me what was the exact relationship between Continental and Harbor. It's my understanding that in 1976 Continental acquired stock in Harbor, and that stock was later sold to NAC in 1990. And as part of that sale there was an assumption agreement entered into between Continental and Harbor in which Continental assumed the liabilities of certain policies issued by Harbor that were in effect prior to 1990. |

Id. at 11.

By order dated October 22, 2004, the bankruptcy court dismissed the motion on the basis that it should have been brought as an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001. On October 21, 2005, the Carriers filed an adversary proceeding raising basically the same substantive issue that was raised by the Porter Entities in the motion to clarify. On March 14, 2006, the Carriers and the Porter Entities filed cross-motions for summary judgment with the bankruptcy

court on the issue whether the Settlement Agreement applied to Harbor and the Harbor policies. The parties agreed that the Settlement Agreement is not ambiguous.

The bankruptcy court heard oral argument on August 24, 2006. During the oral argument, counsel for the Carriers noted that it was "uncontested and undisputed that Harbor is a predecessor and assignor of Continental. . . ." (Tr. of hearing held Aug. 24, 2006, Tr. at 8). Counsel for the Porter Entities argued that the Porter Entities did not assume the risk of releasing claims against carriers not identified in the Settlement Agreement and felt that the Carriers, likewise, did not intend to include unnamed carriers in the release. (Id. at 11, 12). The issue whether the parties were aware of Harbor and the claims against Harbor at the time of the Settlement Agreement was raised as reflected in the following colloquy:

> Court: If there was knowledge on the part of the [C]arriers that there was a policy outstanding that they knew about and they withheld that information from you, wouldn't that be a matter you should plead and have on the table?
>
> Counsel for the:
> Porter Entities: That is an issue and we are – we have alluded to that in our briefs. It's clearly an issue of concern because this [S]ettlement [A]greement clearly has representations by [Continental] that they disclosed and searched for all carriers.
>
> Were they aware about the relationship between [Continental] and Harbor at the time, absolutely. Absolutely. their re-insurance agreement was, I think, in 1990 or 1991. So absolutely they knew about Harbor.

Id. at 18. Counsel for the Porter Entities, however, acknowledged that there was no claim for fraud raised. Id. at 21. None of the parties believed that an evidentiary hearing was necessary because they agreed there was no ambiguity in the Settlement Agreement. Id. at 25.

6

The bankruptcy court entered the Order on December 26, 2006, denying the Porter Entities' motion for summary judgment and granting the Carriers' motion for summary judgment. In its Opinion, the bankruptcy court held that section 3.3 of the Settlement Agreement constitutes a general release and that Harbor, as a predecessor or assignor to Continental, is included as a released party within the general release provisions of the Settlement Agreement.[2] (Doc. No. 7-2 at 8). In reaching this decision, the bankruptcy court specifically referred to section 3.3 of the Settlement Agreement, set forth above, opining that this section is a clear, general release of all claims against the Carriers as well as related entities, including predecessors and assignors. On January 4, 2007, the Porter Entities timely filed this appeal.

The Porter Entities argue that the bankruptcy court erred in finding that the Settlement Agreement applies to Harbor and the Harbor policies because the terms of the Settlement Agreement limit the release to policies issued by the Carriers and the Harbor policies were not issued by the Carriers. The Carriers respond that the bankruptcy court correctly determined that the clear language

---

[2]In its opinion, the bankruptcy court determined that Harbor is a "predecessor" and an "assignor" based upon the uncontroverted documentation provided by the Carriers. This documentation consisted of a Stock Purchase Agreement, dated as of March 14, 1990, showing that The Continental Corporation, the former parent company of Continental and Harbor, sold all of Harbor's stock to NAC Reinsurance Corporation; and an Assumption, Reinsurance and Administration Agreement, dated December 13, 1990, wherein Harbor ceded, assigned, and transferred to Continental 100% of the obligations and liabilities for all insurance policies in effect as of the closing date of the sale of Harbor to NAC Reinsurance Corporation. The Harbor policies in issue were in effect at that time. The bankruptcy court noted that this documentation was "not contradicted by Porter" and "sufficiently shows that Harbor is a 'predecessor' and an 'assignor' to Continental. Opinion at 8. In their appeal brief, the Porter Entities do not dispute this specific finding by the bankruptcy court. Rather, the Porter Entities focus their appeal on the determination that the Settlement Agreement applies to Harbor despite the fact that the Harbor policies were was not issued by the Carriers, "[t]o be clear, Porter does not dispute that Harbor is a released party under the Agreement with respect to claims under policies issued by the Carriers." (Doc. No. 7 at 21).

7

of the general releases in the Settlement Agreement released all claims by the Porter Entities against the Carriers for insurance coverage under any insurance policy of the Carriers or any related entities, including Harbor. For the reasons discussed below, the decision of the bankruptcy court is affirmed.

### III. STANDARD OF REVIEW

District courts have appellate jurisdiction over final judgments, orders and decrees of the bankruptcy court. 28 U.S.C. § 158(a)(1). The facts underlying this appeal are undisputed and the conclusions of law made by the bankruptcy court are reviewed *de novo*. *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Environmental Energy, Inc.),* 188 F.3d 116, 122 (3d Cir. 1999) (explaining that "[a] bankruptcy court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts"). In reviewing a bankruptcy court's decision on a motion for summary judgment, a district court exercises plenary review. *See Rosen v. Bezner,* 996 F.2d 1527, 1530 (3d Cir. 1993) ("Because summary judgment is only appropriate where there is no issue of material fact and judgment is appropriate as a matter of law, our review of a grant of summary judgment is plenary.").

### IV. DISCUSSION

The Porter Entities purport to raise four arguments in support of their appeal from the Order: (a) the Settlement Agreement does not release Harbor from its contractual obligations under the Harbor policies; (b) the bankruptcy court inappropriately ignored the plain language of the Settlement Agreement and relied on a single participial phrase to conclude that the parties intended to release Harbor from its obligations under the Harbor policies; (c) contrary to the bankruptcy

court's opinion, the Settlement Agreement was not intended to be a broad general release; and (d) Harbor is not released under the Settlement Agreement from the Harbor policies as a predecessor or assignor of Continental. (Doc. No. 7). These arguments are intertwined and raise the discrete issue to be decided by this court: whether as a matter of law the Settlement Agreement releases Harbor from its obligations under the Harbor policies?

"In construing a contract, a court's paramount consideration is the intent of the parties." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980) (citing *O'Farrell v. Steel City Piping Co.*, 403 A.2d 1319, 1324 (Pa. Super. Ct. 1979)); *see Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir.1995). The strongest external sign of agreement between contracting parties is the words they use in their written contract. *Mellon Bank,* 619 F.2d at 1009.

The well-settled rules of contract construction require this court to determine, preliminarily, whether the Settlement Agreement is ambiguous with respect to the dispute between the parties. *United States v. Pantelidis,* 335 F.3d 226, 235 (3d Cir. 2003) (citing *Sumitomo Machinery Corp. of America, Inc. v. AlliedSignal, Inc.*, 81 F.3d 328, 332 (3d Cir. 1996)); *Duquesne Light Co.,* 66 F.3d at 613. A contract is ambiguous "where the contract is susceptible of more than one meaning," *Sumitomo Machinery*, 81 F.3d at 332, or "if it is subject to reasonable alternative interpretations." *Taylor v. Continental Group Change in Control Severance Pay Plan,* 933 F.2d 1227, 1232 (3d Cir. 1991). "A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." *Duquesne Light Co.,*66 F.3d at 614. In making the ambiguity determination, the court should consider the words of the contract, the alternative meanings suggested by counsel,

9

and the nature of the objective evidence to be offered in support of that meaning.[3] *Mellon Bank,* 619 F.2d at 1011.

Once it is determined that the terms of a contract are not ambiguous, the court must then look only to the contract at issue for interpretation and accord the terms in the contract their plain meaning. *See In Re Sugarhouse Realty, Inc.*, 192 B.R. 355, 363 (E.D. Pa. 1996) (quoting *Steuart v. McChesney,* 444 A.2d 659, 661 (Pa. 1982) ("When the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.")); *see also Mellon Bank*, 619 F.2d at 1010 ("[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone") (citations omitted). A contract should be read to give effect to all its provisions and to render them consistent with each other. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

The parties agree, as they did below, that the Settlement Agreement is unambiguous and that the language included in section 3.3 is "clear" and "unequivocal." (Doc. Nos. 7 at 4, 8; 13 at 10-11). The dispute, instead, concerns their competing interpretations of section 3.3 of the Settlement Agreement.[4] After reviewing the parties' submissions and hearing oral argument, the bankruptcy court found no ambiguity in the language of the Settlement Agreement. (Doc. No. 7-2 at 5).

---

[3]Here, the parties' arguments in support of their respective interpretations of the Settlement Agreement are based solely upon the language contained the Settlement Agreement. No party offered parol evidence regarding the bargaining history of the parties or any parties' knowledge of the Harbor policies, except that counsel for the parties made representations during the hearings before the bankruptcy court regarding the parties' knowledge of the Harbor policies. See discussion of the factual background <u>supra</u> at 4-7. (Doc. Nos. 7 at 4-5; 13 at 17).

[4]As stated by the Porter Entities in their brief, "the crucial, clear and unequivocal language at issue is set forth in section 3.3 of the Agreement." (Doc. No. 7 at 8).

Consistent with the parties' positions as well as the decision of the bankruptcy court, this court also finds the terms of the Settlement Agreement to be unambiguous.  *See Duquesne Light Co.,* 66 F.3d at 614 (a contract is not rendered ambiguous by the mere fact that the parties do not agree on proper construction) (citations omitted).  After reviewing the language of the Settlement Agreement, section 3.3 in particular, this court finds that the Settlement Agreement is not susceptible to the interpretation proffered by the Porter Entities.  Section 3.3 plainly states that the Porter Entities **released** the Carriers as well as their "**predecessors**, successors, **assignors**, assigns, divisions and merged or acquired companies . . . **from any and all claims** . . . *including but not limited to* all claims . . . associated with or in any way related to any insurance policies issued or allegedly issued by the Carriers at any time."  (Doc. Nos. 7-2 at 6; 7-3 at ¶3.3) (emphasis added).  This release is expressed in broad, unqualified terms and none of the terms included therein are vague or obscure or subject to a double meaning.  *See United States v. Yusuf*, No. 05-3019, 2006 WL 2578380, at *3 (3d Cir. Sept. 7, 2006) (holding that the contract at issue was not ambiguous because the terms were broad and unqualified as opposed to vague or obscure words subject to a double meaning) (quoting *Landtect Corp. v. State Mut. Life Assurance Co. of Am.*, 605 F.2d 75, 80 (3d Cir. 1979)) ("[a]n ambiguous contract is one capable of being understood in more senses than one; an agreement obscure in meaning through indefiniteness of expression, or having a double meaning . . . .").  Section 3.3 is reasonably understood as having only one meaning, namely, that the Porter Entities were releasing the Carriers, their predecessors, assignors and other related entities from any and all known or unknown claims.

While this court recognizes, as did the bankruptcy court, that the phrase "policies issued or allegedly issued by the Carriers" is found throughout the Settlement Agreement, there is no language

11

anywhere in the Settlement Agreement that could reasonably be construed to limit the scope of the release in section 3.3 to claims only related to policies issued by the Carriers. For instance, section 5 states:

> 5. It is the intention of the Parties to this Agreement that, in exchange for the Settlement Payment, [each of the] Porter [Entities] shall, to the fullest extent of its actual and legal authority, **release all claims under all policies of insurance actually or allegedly providing or potentially providing coverage to Porter [Entities] by the Carriers. This release <u>and the one provided for in paragraph 3.3</u> hereof are therefore intended to apply, and do apply, to all insurance policies, known or unknown, actually or allegedly issued by the Carriers**, including but not limited to the insurance policies listed in Attachment "A" hereto. [Each of the] Porter [Entities] agrees that if it should learn after the execution of this Agreement of the existence or possible existence of additional policies issued by the Carriers, it will not assert any claim against any of the Carriers on account of any such insurance policies.

(Doc. No. 7-3 at ¶ 5)(emphasis added). This provision does not state that the Porter Entities' release is "limited to" all claims under all policies by the Carriers, or that the release provided for in section 3.3 is intended to apply "only to" all policies issued by the Carriers. The Porter Entities point to seven other provisions of the Settlement Agreement which include the language, "policies issued by the Carriers." (Doc. No. 7 at 9-10). Again, restrictive terms such as "only" or "limited to" are entirely absent from these provisions which include no language expressly limiting the scope of section 3.3. (Doc. No. 7-3). Indeed, there is not one provision in the entire Settlement Agreement which plainly states that the release is limited to claims relating to policies issued by the Carriers. Certainly, if the parties did *not* intend for the Settlement Agreement to apply to claims relating to

12

policies which were *not* issued by the Carriers, they would have included specific language in section 3.3 to that effect.[5]

Additionally, the schedule of policies issued by the Carriers and listed in Attachment A to the Settlement Agreement does not limit the scope of section 3.3. Even the Porter Entities concede that under their limited interpretation of the Settlement Agreement the release is not limited to the policies listed in Attachment A. (Doc. No. 7 at 21).

The Porter Entities' argument that the bankruptcy court misinterpreted section 3.3 because the "including but not limited to" language does not relate to the subsequent phrase "for costs and liabilities associated with or in any way related to any insurance policies issued or allegedly issued by the Carriers" defies common usage of the phrase "including but not limited to." Section 3.3 indicates that the parties intended to include all claims, including those arising out of policies issued by the Carriers, but not limited to those. Faced with a similar argument raised by a plaintiff-releasor the United States Court of Appeals for the Seventh Circuit instructed, "if the parties had wished to limit the claims only to those arising out of these statutes, they would not have used the phrase 'but without limitation of the foregoing' or the term 'including' (which implies these claims are part of

---

[5]The parties did not raise any issue concerning a mutual mistake. *See Regions Mortg., Inc. v. Muthler*, 889 A.2d 39 (Pa. 2005); *see also Mellish v. Hurlock Neck Duck Club, Inc.,* 886 A.2d 1151, 1159 (Pa.Cmwlth. Ct. 2005) (holding that mutual mistake is found where both parties to a contract are mistaken as to existing facts at the time of execution). The parties also did not argue that there was a unilateral mistake. "Generally, if a mistake is not mutual, but unilateral, and is not due to the fault of the party not mistaken, but to the negligence of the one who acted under the mistake, it affords no basis for relief." *Kramer v. Schaeffer,* 751 A.2d 241, 246 (Pa. Super. Ct. 2000) (citations omitted). When, however, there is mistake on one side and fraud on the other, or, where the other party knows of the unilateral mistake, reformation or recision are available remedies to the mistaken party. *Id.* (citing *Cook v. Liston*, 43 A. 389, 390 (Pa. 1889); *see Regions Mortg., Inc.*, 889 A.2d at 42 (holding that in the case of unilateral mistake, the party against whom reformation is sought must be shown to have knowledge of the mistake sufficient to justify an inference of fraud or bad faith).

the world of claims they were trying to settle)." *Capocy v. Kirtadze*, 183 F.3d 629, 634 (7th Cir. 1999) (holding that where references to certain statutes was accompanied by the phrase "but without limitation of the foregoing," the settlement agreement was not limited to claims arising out of those statutes). Applying the same analysis here, if the Porter Entities and the Carriers had wished to limit the released claims to only those arising out of policies issued by the Carriers, they would not have used the phrase "not limited to" or the term "including" in section 3.3.

The Porter Entities also contend that the bankruptcy court's interpretation of the Settlement Agreement violates the rules of contract construction because it renders certain provisions of that agreement meaningless. (Doc. No. 7 at 18). For example, the Porter Entities point to the latter half of the phrase at issue in section 3.3 which states, "for costs and liabilities associated with or in any way related to any insurance policies issued or allegedly issued by the Carriers at any time." The Porter Entities argue that if the Settlement Agreement applies to all insurance policies issued by the Carriers as well as their related entities, this portion of section 3.3 is "completely meaningless." (Doc. No. 7 at 18). This argument is unpersuasive. While this language may be somewhat superfluous, just as the reference to specific statutes was superfluous in *Capocy,* references to specific claims, which are at the root of the settling parties' dispute, in a general release are somewhat common practice. *See* WILLIAM W. SCHWARZER, A. WALLACE TASHIMA & JAMES M. WAGSTAFFE, FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 15, Form 15:C (2007); 12-179 DUNLAP-HANNA PENNSYLVANIA FORMS Form 179.09-11.5 (General Release). Out of an abundance of caution, lawyers drafting settlement agreements with broad, global releases commonly refer to the particular claims disputed by the parties despite the fact that those particular claims are clearly subsumed by the broad language included in the releases. Id. The bankruptcy court's interpretation

of the Settlement Agreement does not violate the principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other. *See Mastrobuono,* 514 U.S. at 63.

The Porter Entities raise additional points in support of their interpretation of section 3.3 of the Settlement Agreement. The Porter Entities repeatedly point out that Harbor was not a party to the Settlement Agreement. (Doc. No. 7 at 2, 6, 9). Harbor, however, could be released by the Settlement Agreement even though it did not sign the Settlement Agreement or give authority to another to sign on its behalf. *See TIG Ins. Co. v. Combustion Engineering Inc. (In Re Combustion Engineering, Inc.)*, 366 F. Supp. 2d 224, 234 (D.N.J. 2005). The Porter Entities make the argument that the Carriers had "every opportunity to include Harbor and/or the Harbor policies" in the Settlement Agreement. (Doc. No. 7 at 19). In fact, the Porter Entities could have sought information about which policies, in addition to those issued by the Carriers, might potentially be issued by entities related to the Carriers and, therefore, covered by the Settlement Agreement. The Porter Entities argue that Continental's relationship with Harbor does not alter Harbor's obligations to the Porter Entities. (Doc. No. 7 at 22). In making this argument, the Porter Entities do not acknowledge or seek to distinguish the language of the Settlement Agreement under which they released the Carriers and all related entities, including predecessors or assignors such as Harbor. Indeed, none of the decisions or secondary sources cited by the Porter Entities address the situation where the insured releases the insurers and their related entities from all claims, as is present in this case. *See Giant Food Stores, Inc. v. Marketplance Communications Corp.*, 717 F. Supp. 1071, 1077 (M.D. Pa. 1989) (did not involve a release of claims by the claimant); *Klauder and Nunno Enterprises, Inc. v. Hereford Assocs.*, 723 F. Supp. 336 (E.D. Pa. 1989) (did not involve a release by third-party

complainant of third-party defendant contractor); *see also Cleveland v. Commonwealth Nat. Ins., Co.* 269 F. Supp. 2d 752, 756 (S.D. Miss. 2003) (did not involve a release by the insured in favor of the insurers); *Haley v. AIG Life Ins. Co.*, 2002 WL 417419, *4 (D.N.D. 2002) (no discussion or involvement of release by policyholder of claims against insurers); *Security Benefit Life Ins. Co. v. Federal Deposit Ins. Corp.*, 804 F. Supp. 217 (D. Kan. 1992) (did not address an obligee's rights when the obligee has released the original obligor as well as the new obligor from any and all claims); *Travelers Indemnity Co. v. Gillespie*, 785 P.2d 500, 508-09 (Cal.1990) (did not involve a release by insured in favor of insurers, but, explained that the burden of an obligation may be transferred with the consent of the party entitled to its benefit); RESTATEMENT (SECOND) OF CONTRACTS § 318(3) (1981) (discussed assignment of delegation, but not the effect of an obligee's release of the obligor-assignor and obligor-assignee); 4 A.CORBIN, CORBIN ON CONTRACTS § 866 (1951) (discussed the assignment of legal duties, but did not address the effect of a release by the obligee in favor of the obligor-assignor and obligor-assignee); 19 G. COUCH, COUCH ON INSURANCE 2d § 80:64 (rev. ed.1983) (discussed liability of original insurer, but not original insurer's liability when the insured releases both the original insurer and new insurer); 14 HOLMES, APPLEMAN'S ON INSURANCE: LAW OF REINSURANCE § 109.20 ("[t]he original insurer remains jointly obligated with the assuming insurer, *absent a valid release by the policyholder of the original insurer from its obligations"*) (emphasis added).

Finally, the Porter Entities rely heavily upon two decisions, *In re Combustion Engineering* and *Travelers Insurance Co. v. McDermott*, No. 01-3218, 2003 U.S. Dist. LEXIS 15339 (E.D. La. Aug. 22, 2003), in support of their limited interpretation of the Settlement Agreement. Those decisions, however, are inapposite to the issue raised here. The settlement agreement at issue in *In*

*Re Combustion Engineering* was determined to be ambiguous – "[l]ooking at the Agreement as a whole, it is impossible to reconcile the conflicting provisions of the document and discern the intent of the contracting parties based on the language alone." *Combustion Engineering*, 366 F. Supp. 2d at 234. Consequently, the district court considered the bargaining history of the parties, in particular, evidence that the settling parties only discussed a single insurance policy during negotiations. *Id.* at 234-35. Here, however, the parties agree that the Settlement Agreement is not ambiguous and, as a consequence, have not offered evidence of their bargaining history. Additionally, the "heart" of the release in the Settlement Agreement is section 3.3 in which the Porter Entities plainly and broadly released the Carriers and all related entities including their predecessors and assignors, like Harbor, from all claims. Contrastingly, the "heart" of the agreement in *In re Combustion Engineering* was two conflicting release provisions, one held to be broad and the other narrow in scope. *Id.* at 227.

The facts in *Travelers* are also too dissimilar to this case for the court's analysis in that decision to be applicable here. Unlike the facts presented here, but similar to the argument raised by the insurers in *In re Combustion Engineering*, the insurers in *Travelers* relied upon the broad definitions of the settling parties, not the release language, in support of their argument that the settlement agreement at issue was broad and not limited to policies issued by Aetna. *Travelers*, 2003 U.S. Dist. LEXIS 15339 at *13. The court found there that, despite the all-inclusive definitions of Aetna, the recitals and the release provisions indicated that the agreement was narrowly designed to settle and release only Aetna's liability under the excess insurance policies at issue there. *Id.* Here, however, as discussed above, the release language is not narrowly tailored; the release language in

17

section 3.3 plainly and broadly releases the Carriers and all related entities from all claims. *Travelers* is simply too dissimilar to be applicable here.

V.  **CONCLUSION**

In accordance with the foregoing discussion, the court finds that the bankruptcy court did not err in concluding that section 3.3 of the Settlement Agreement is unambiguous and that under the terms of that section the Porter Entities released the Carriers **and** their related entities, such as Harbor, from all claims, known or unknown. The Porter Entities' appeal from the bankruptcy court's order will be denied. An appropriate order will issue.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: November 15, 2007

cc:   All Counsel of Record

   Honorable Warren W. Bentz
   United States Bankruptcy Judge